### A09A1482, A09A1483. LAWSON v. THE STATE (two cases).

(684 SE2d 1)

MIKELL, Judge.

A Clayton County Grand Jury indicted brothers Damaris and Marcus Lawson for numerous offenses related to the robbery of two taxicab drivers, including armed robbery, aggravated assault, possession of a weapon during the commission of a crime, simple battery, and obstruction of a law enforcement officer. Following a joint trial, Damaris and Marcus were convicted of one count of armed robbery, one count of robbery, four counts of aggravated assault, and one count of possession of a weapon during the commission of a crime. The jury also convicted Marcus of one count of simple battery of a law enforcement officer and one count of obstruction of a law enforcement officer. The trial court sentenced both men to thirty years in prison. On appeal from the denial of their joint motion for new trial, Damaris and Marcus contend that the trial court erred in failing to suppress evidence found in their home. We affirm.

In reviewing a trial court's order suppressing evidence,

the trial court's application of the law to the facts is subject to de novo review if the facts are stipulated, or if the critical facts do not depend on the testimony of witnesses who are subject to cross-examination. However, a trial court's ruling on a motion to suppress frequently involves a mixed question of fact and law. When the outcome of a motion to suppress depends on the credibility of the witnesses or on disputed facts, and the trial court has not committed an error of law, the court's ruling will not be disturbed on appeal. As reviewing court, we must accept the factual and credibility determinations and inferences drawn by the trier of fact, even if we disagree with them, as long as there is evidence in the record to support the trial court's findings.[1]

"Further, in reviewing the denial of a motion to suppress, we consider all the evidence of record, including evidence introduced at

---

[1] (Footnote omitted.) *Laseter v. State*, 294 Ga. App. 12, 13 (1) (668 SE2d 495) (2008).

trial."[2] So viewed, the record reflects that on March 11, 2007, Maria Hernandez was working as a dispatcher for Victor's Taxi when she received a call for a taxi. Due to the volume of calls that evening, Hernandez decided to take the call herself instead of dispatching another driver. Hernandez and her boyfriend, Kevin Osorio, drove to the specified location, 8470 Pineland Drive, but could not locate the address. Hernandez was stopped by two men in the roadway who claimed to have called for a taxi. The two men got into the vehicle, and Hernandez drove them to a nearby gas station and waited outside while they went into the store. The men returned to the taxi and asked to be taken to another location. As the taxi drove down a dead end street, one of the men produced a long knife, held it to Osorio's neck and demanded money. The other man pushed an object into Hernandez's side and demanded her cell phones. After Osorio gave the men approximately $100, they jumped out of the taxi and fled.

On March 12, 2007, John Pittman was driving a taxi when he received a call to pick up a fare on Pineland Drive. When he arrived on the street, he was unable to locate the address that he had been given. He blew his horn and observed two men walking out of a home. The men approached Pittman and acknowledged that they had called for a taxi. Pittman drove the men to a Chevron gas station and waited outside while they went into the store. The men then returned to the taxi and asked Pittman to return them to the Pineland neighborhood. En route, the men told Pittman to turn down a different street and to stop at a duplex at the end of the street. When Pittman came to a stop, one of the men began to choke him from behind. The men demanded money and Pittman's wallet. The men fled into the woods with $37, Pittman's wallet, and a cell phone a previous passenger had left in the backseat of the taxi.

Pittman called 911 and met Clayton County police officer Katherine Strickland at a nearby gas station. Strickland accompanied Pittman back to the incident location, where she met other officers from the department's K-9 unit. Pittman indicated that the two subjects had fled into a wooded area, and K-9 officer Robert Warner released his K-9 into that area. The dog followed the scent through the wooded area to a location on Pineland Drive and alerted to an area between 8452 and 8453 Pineland Drive. Strickland took Pittman to Pineland Drive, where he identified the house at 8452 as being the one his attackers had exited before entering the taxi. Based on this information, Warner applied for a search warrant to search 8452 Pineland Drive, which was denied by a Clayton County magistrate.

---

[2] (Footnote omitted.) *Whitehead v. State*, 258 Ga. App. 271, 273 (1) (574 SE2d 351) (2002).

Officers Strickland and Warner, accompanied by two other officers, then approached the home and knocked on the door for approximately 30 minutes, but no one answered. Strickland then located an open window at the front of the house and Warner yelled into the window, "Clayton County Police, is anyone inside?" A male voice from inside the home replied, "what's going on?" At trial and at the suppression hearing, Warner explained that the blinds were down, but that after the man spoke, he used his expandable ASP baton to move the blinds back "so [that] the subject could see that it was, in fact, the police." Warner told the man that an armed robbery had occurred in the area and that the subjects had run to that location. According to Warner, he wanted to make sure everyone was okay. Moments later, the man, wearing a t-shirt and underwear and later identified as Marcus, opened the front door and again asked, "What's going on[?]" Warner stepped from the window to the door and asked Marcus for identification. Marcus said he did not have any and then struck Warner on the side of his head.[3] The other officers took steps to arrest Marcus for simple battery. The officers attempted to pull Marcus away from the door and into the yard, a location where they could see him better and clear him for possible weapons, but Marcus resisted and held firm to the doorjamb. Officers eventually pushed Marcus back into the residence in order to release his grip from the door and then handcuffed him.

Within one to two feet of the open door, lying face up on the floor in plain view, was Pittman's prison identification card. Officers then conducted a security sweep in order to determine if anyone else was in the home. Officers observed a knife lying on the coffee table in plain view and discovered Damaris in a back bedroom, along with Pittman's wallet. Damaris could not provide identification, so he was detained by police. Pittman identified Marcus and Damaris at the scene as the men who robbed him.

Hernandez and Osorio, who were brought to the location, also identified Marcus and Damaris as the men who robbed them the previous night. Several hours later, at approximately 3:30 a.m., Clayton County Police Detective Larry White obtained a search warrant for 8452 Pineland Drive. When White executed the warrant at 6:30 a.m. that same morning, he recovered Pittman's prison identification card, a long knife matching the description of the one used on Osorio, and the cell phone taken from Pittman's taxi.

---

[3] Throughout their brief, appellants incorrectly state that Damaris was arrested for punching Officer Warner. To the contrary, the record reflects that Marcus was indicted and found guilty of simple battery on a law enforcement officer and obstruction of a law enforcement officer.

According to Pittman, 90 minutes elapsed between the time he and Strickland arrived at 8452 Pineland Drive and Marcus's arrest.

Before trial, Damaris and Marcus moved to suppress the evidence recovered by Detective White. Following a hearing, the trial court denied the motion. Damaris and Marcus filed a joint motion for new trial, which was denied by the trial court.

1. In their first enumerated error, Damaris and Marcus contend that the trial court should have granted them a new trial because the evidence found in the home was the result of a warrantless search and should have been suppressed as "fruit of the poisonous tree." The state concedes that Warner's use of the baton was improper, but argues that his actions were not flagrant misconduct and that the intervening circumstances of Marcus's arrest cleanse any misconduct by the officer. We agree with the state.

The Fourth Amendment protects citizens from unreasonable government intrusion into their homes. It is well settled Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.[4] The "fruit of the poisonous tree" doctrine provides that any evidence acquired by the police through exploitation of information obtained by means of unlawful conduct is inadmissible in a criminal prosecution.[5] In determining whether evidence must be excluded under this doctrine, we must ask "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."[6] If the prosecution can show that any connection between official illegality and the prosecution's evidence has "become so attenuated as to dissipate the taint," the evidence will be admissible.[7] In *Brown v. Illinois*,[8] the Supreme Court held that this issue must be "answered on the facts of each case" and that "[n]o single fact is dispositive."[9] The Supreme Court set forth several factors for lower courts to consider in making this determination, including "the time elapsed between the illegality and the acquisition of the evidence; the presence of intervening

---

[4] *Brigham City v. Stuart*, 547 U. S. 398, 403 (II) (126 SC 1943, 164 LE2d 650) (2006).

[5] See *Wong Sun v. United States*, 371 U. S. 471, 485 (II) (83 SC 407, 9 LE2d 441) (1963).

[6] (Citation and punctuation omitted.) Id. at 488 (III). See also *Vergara v. State*, 283 Ga. 175, 184 (2) (657 SE2d 863) (2008).

[7] (Punctuation omitted.) See *Wong Sun*, supra at 491 (V), quoting *Nardone v. United States*, 308 U. S. 338, 341 (60 SC 266, 84 LE 307) (1939).

[8] 422 U. S. 590 (95 SC 2254, 45 LE2d 416) (1975). Although *Brown v. Illinois* dealt with the exclusion of a defendant's statements, it applies equally to seized evidence. See *Spence v. State*, 281 Ga. 697, 700-702 (3) (642 SE2d 856) (2007).

[9] *Brown*, supra at 603 (III).

circumstances; and the purpose and flagrancy of the official miscon-duct."[10]

Here, in analyzing the first factor, we acknowledge that little time elapsed between Warner's act of pushing aside the blinds and the acquisition of the inculpatory evidence. However, this factor is not dispositive.[11] In considering the other two factors, we find that the taint of Warner's illegal act was sufficiently dissipated. With regard to the third factor, the record reflects that Warner pushed aside the blinds for safety reasons only after Marcus voluntarily questioned what was going on and that Warner did not view any evidence in the home that was ultimately gathered pursuant to the search warrant. The trial court found no evidence of flagrant misconduct, and we will not disturb this conclusion. In any event, it is the second factor that is dispositive in this case. Marcus's act of voluntarily opening the door of the home, attacking Warner, and then resisting arrest were intervening acts that completely purged the taint from Warner's initial unlawful act.[12] If Marcus had not attacked Warner and then resisted arrest, the evidence found in the home would be inadmissible as fruit of the poisonous tree. What distinguishes this case is the independent and intervening action of voluntarily opening the front door and attacking the officer. These acts broke the chain of causation and dissipated the taint of Warner's arguably illegal act. Under these circumstances, we hold that any taint flowing from the prior illegal act was too attenuated to affect the admissibility of the challenged evidence.

2. In their second enumerated error, Damaris and Marcus contend that the trial court erred in concluding that Marcus's warrantless arrest justified a protective sweep of the home. We disagree.

An officer may arrest a suspect without an arrest warrant if an offense has been committed in his presence.[13] And while an officer generally must have a search warrant or consent to enter a home to make an arrest, an officer can enter a home to arrest a suspect when he or she has followed the suspect there in "hot pursuit."[14] "[A] suspect may not defeat an arrest which has been set in motion in a

---

[10] (Punctuation omitted.) *Spence*, supra at 700 (3), citing *Brown*, supra at 603-604 (III), and *United States v. Parker*, 469 F3d 1074, 1078 (II) (A) (7th Cir. 2006).

[11] *Brown*, supra at 603 (III).

[12] See, e.g., *United States v. Bailey*, 691 F2d 1009, 1017-1018 (II) (11th Cir. 1982) ("[P]olice may legally arrest a defendant for a new, distinct crime, even if the new crime is in response to police misconduct and causally connected thereto. . . . If the police lawfully have arrested a suspect, then they may properly conduct [a search incident to a lawful arrest]") (citations and footnote omitted).

[13] OCGA § 17-4-20 (a).

[14] (Citations omitted.) *Brown v. State*, 163 Ga. App. 209, 210 (1) (294 SE2d 305) (1982).

public place . . . by the expedient of escaping to a private place."[15] In *Santana*,[16] the Supreme Court held that for Fourth Amendment purposes, one who is in the threshold of his dwelling is in a public place and not within the dwelling.[17] This holding was based on the Supreme Court's prior ruling in *Katz v. United States*,[18] that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."[19] In this case, Marcus's warrantless arrest did not violate the Fourth Amendment. Marcus voluntarily opened the door of his home and was standing in the doorway when he struck Warner. When Marcus held fast to the doorjamb, attempting to thwart or evade arrest, officers were authorized to effectuate an in-home arrest.[20] The officers were also entitled to search Marcus's immediate person and presence pursuant to his arrest.[21] Finally, officers were justified in conducting a protective sweep of the home. "A 'protective sweep' is a limited search of the premises primarily to ensure officer safety by detecting the presence of other occupants."[22] Police officers are authorized to make a protective sweep in conjunction with an in-home arrest when they possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."[23] In light of the circumstances, including the officers' observation of Pittman's identification card in plain view, their knowledge that two men were involved in the armed robbery, and the fact that Marcus opened the door to the home identified by Pittman, it was not unreasonable for officers to suspect that the second person related to the armed robbery was concealed somewhere in the home and that he could pose a danger to those on the arrest scene.[24] Therefore, the protective sweep was authorized, and the trial court did not err in denying appellants' motion for new trial on the ground of illegally obtained evidence.

*Judgment affirmed. Johnson, P. J., and Ellington, J., concur.*

---

[15] *United States v. Santana*, 427 U. S. 38, 43 (II) (96 SC 2406, 49 LE2d 300) (1976).

[16] Id.

[17] Id. at 41-42 (II).

[18] 389 U. S. 347 (88 SC 507, 19 LE2d 576) (1967).

[19] (Citations omitted.) Id. at 351.

[20] See, e.g., *Brock v. State*, 196 Ga. App. 605, 607 (2) (396 SE2d 785) (1990).

[21] OCGA § 17-5-1; *Jenkins v. State*, 223 Ga. App. 486, 488 (1) (477 SE2d 910) (1996). See also *Lentile v. State*, 136 Ga. App. 611, 614 (1) (222 SE2d 86) (1975) ("[a] police officer is free to use and seize what he sees *in plain sight* if he is at a place where he is entitled to be") (citations and punctuation omitted; emphasis in original).

[22] (Citations omitted.) *State v. Pando*, 284 Ga. App. 70, 72 (1) (b) (643 SE2d 342) (2007).

[23] *Maryland v. Buie*, 494 U. S. 325, 334 (III) (110 SC 1093, 108 LE2d 276) (1990).

[24] See, e.g., *Inglett v. State*, 239 Ga. App. 524, 525 (1) (521 SE2d 241) (1999).

DECIDED JULY 15, 2009 —
RECONSIDERATION DENIED AUGUST 27, 2009 

*Lee Sexton*, for appellants.

*Tracy G. Lawson, District Attorney, Robert C. Watts, Assistant District Attorney*, for appellee.